IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

SERGEANT JACK REYES and )
SERGEANT JOSE ANTONIO )
HERNANDEZ, )
 )
              Plaintiffs, )
 )
v. ) Civil Action No. 02-1283-KAJ
 )
SHERRY FREEBERRY and COLONEL )
JOHN L. CUNNINGHAM, both )
individually and in their official capacity, )
and NEW CASTLE COUNTY, a )
municipal corporation, )
 )
              Defendants. )

**MEMORANDUM OPINION**

---

Thomas S. Neuberger, Esquire, Stephen J. Neuberger, Esquire, The Neuberger Firm, P.A., 2 East 7th Street - Suite 302, Wilmington, Delaware 19801; Counsel for Plaintiffs.

Mark R. Owens, Esquire, Klett, Rooney, Lieber & Schorling, P.C., 1000 West Street, Suite 1410, Wilmington, DE 19801; Counsel for Defendants.

---

December 29, 2005
Wilmington, Delaware


JORDAN, District Judge

**Introduction**

This case is before me on remand from an interlocutory appeal taken by the plaintiffs, Jack Reyes ("Reyes") and Jose Antonio Hernandez ("Hernandez"), challenging, among other things,[1] an oral order I entered during a teleconference with the parties on January 15, 2004. That order was entered in an attempt to maintain the status quo while I considered the parties' dispute over alleged violations of a protective order to which they had stipulated. (See Tr. at 12-13.)[2] On appeal, the plaintiffs also challenged the protective order itself (D.I. 17). The United States Court of Appeals for the Third Circuit questioned whether it had jurisdiction to consider the appeal, and it remanded the case for further development of the record, instructing that I should "clarify (a) the scope of the restrictions that ... [have been] placed on the disclosure of court records and discovery information and on communications by counsel to the media and (b) the reasons for any such restrictions." *Reyes v. Freeberry*, 141 Fed. Appx. 49, at *52 (3d Cir. 2005). The Court went on to say that, "[i]n setting out these reasons, the District Court should provide specific reasons for each relevant category of documents or information." *Id.* Following is the required clarification, to the extent I am able to provide it.

---

[1]The appeal also challenged the July 30, 2004 order (Docket Item ["D.I."] 143) staying this case during the pendency of criminal proceedings against Sherry Freebery, one of the defendants in this case, but the appeal on that ground was dismissed. *Reyes v. Freeberry*, 141 Fed. Appx. 49, at *51 (3d Cir. 2005).

[2]Citations to "Tr. at [page number]" are to the transcript of the January 15, 2004 teleconference in this matter, reproduced at D.I. 159, pages A34-49.

1

## Background

On July 10, 2002, the plaintiffs filed their original complaint against the defendants, New Castle County (the "County"), Sherry Freebery, who then served as the County's Chief Administrative Officer, and John L. Cunningham, who was then the senior officer in the County police department (the "Department"). The plaintiffs complained that the two individual defendants and the County "have a policy, custom and practice of discriminating against Hispanic-American officers in promotion decisions and in terms and conditions of employment" in the Department. (D.I. 1 at ¶ 11.) In the eleven counts of the complaint, the plaintiffs alleged various violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et. seq.*, as well as violations of 42 U.S.C §§ 1981 and 1983. (*Id.* at ¶¶ 60-90.) The plaintiffs basically complain of discriminatory promotion decisions, retaliation, and constructive discharge. They have since amended their complaint twice, filing their Second Amended Complaint on June 11, 2004. (D.I. 126.) That version adds another four counts, in which they allege, among other things, that they were subjected to a hostile work environment. (*Id.* at ¶¶ 91-102.)

Given the nature of the allegations, experienced counsel on both sides of the case recognized the need for a protective order to deal with confidential information that would be requested and produced in discovery.[3] The parties presented to the

---

[3] As plaintiffs' counsel has pointed out (D.I. 160 at A610-15), he has had a great deal of experience in employment discrimination suits. Indeed, he has recently appeared as counsel for complainants against the County in several such suits besides this one: *Maloney v. Gordon*, C.A. No. 03-999-KAJ (Oct. 31, 2003); *Riddell v. Gordon*, C.A. No. 04-1201-KAJ (Aug. 27, 2004); *Tobin v. Gordon*, C.A. No. 04-1211-KAJ (Sept. 2, 2004); and *Hicks v. Clark*, C.A. No. 05-445-GMS (June 29, 2005).

2

Honorable Sue L. Robinson, who was the judge to whom the case was then assigned,[4] a "Joint Motion for Protective Order Approving Confidentiality Agreement" (D.I. 17; the "Joint Motion"), in which they asked the court to approve their proposal for handling confidential information. They expressly recited the grounds for the restrictions they sought, saying:

> 1. Plaintiffs, who are a current and former Sergeant in the New Castle County police department, bring this action against Defendants alleging various claims, but centered around alleged discrimination on the basis of national origin in promotions and a hostile environment.
> 2. Plaintiffs have sought various documents relating to their employment with New Castle County, including personnel files, as well as other documents and personnel files of current and former police officers.
> 3. Personnel files and internal affairs files of law enforcement officers are protected from disclosure by Delaware Statute, 11 Del. Code § 9200(c).
> 4. Documents requested by Plaintiffs, including but not limited to the personnel files and internal affairs files, include highly confidential information, which should be protected from disclosure, including but not limited to:
>> a. police strategies and deployment implemented for public protection;
>> b. confidential personnel information, such as family and benefit information, home addresses and phone numbers, salaries, etc.;
>> c. arrest and detainment information for members of the public, including a large amount of information regarding juveniles from inside and outside of Delaware;
>> d. information regarding members of the public who witnesses [sic] crimes, were victims of crimes, were named in domestic relations complaints or otherwise involved in law enforcement matters.
> 5. The parties agree that they will not be disadvantaged in any way by the entry of this protective order. The parties are not seeking to limit the use of the information for the purposes of the litigation. Instead, they are merely seeking to limit the public use and dissemination of this highly sensitive information.

(D.I. 17 at 1-2.)

---

[4]Chief Judge Robinson had the case from its inception until February 5, 2003, when it was reassigned to the Honorable Gregory M. Sleet. (D.I. 19.) On March 12, 2003, the case was reassigned to me. (D.I. 20.)

Chief Judge Robinson accepted the parties' representations and their implied assertion that what they had recited constituted "good cause" for a protective order under Federal Rule of Civil Procedure 26(c).[5] She granted the joint motion on January 23, 2003. (D.I. 17.) Consequently, the parties bound themselves, with court approval, to a Confidentiality Agreement (the "Agreement") incorporating, among other things, the following restrictions.

> 1. A party could designate as "confidential" any "documents, portions of any deposition and/or any transcript of a deposition, exhibits, answers to interrogatories, pleadings, memoranda, and other materials ... ." (*Id.* at Confidentiality Agreement ¶ 1.)
> 2. The Agreement was effectively limited to the County's personnel and investigative information and to identifying information related to third parties.[6] (*Id.* at Confidentiality Agreement ¶ 2.)
> 3. If a party thought that someone had improperly designated something as confidential, that party could seek relief from the court. (*Id.* at Confidentiality Agreement ¶ 3.)

---

[5] Rule 26(c) provides, in relevant part, that, "for good cause shown," the court "may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense ... ."

[6] More particularly, the parties stated their intent that the agreed upon restrictions on information dissemination and use would apply to (a) "documents or information" related to "personnel files, internal affairs files and documents reflecting personal information of County employees ... ;" (b) "documents and information reflecting police activities or strategy;" (c) identifying information regarding witnesses and victims of crimes and arrestees or others having "had involvement in police matters ... ;" and (d) "information which is not otherwise in the public domain." (*Id.* at Confidentiality Agreement ¶ 2.) That last, catch-all provision is too broad to be read literally, since it is not tethered to the good cause recited in the Joint Motion or to the specific categories listed in paragraph 2 of the Agreement. It appears to be nothing more than an attempt to set a backstop for catching information not adequately specified in paragraph 2 but of the same type described therein.

4. Information designated as confidential would in fact be "stamped with the legend 'CONFIDENTIAL' on each page thereof." (*Id.* at Confidentiality Agreement ¶ 4.)[7]

5. Information designated as "confidential" could only be used in litigating this case. (*Id.* at Confidentiality Agreement ¶ 5.)

6. Confidential information would generally be treated on an attorneys-eyes-only basis, with counsel being permitted to share such information with staff, experts, and the parties themselves under certain conditions. (*Id.* at Confidentiality Agreement ¶ 6.)

7. Limitations were imposed on who could possess a copy of confidential information, where it could be stored, under whose supervision it had to remain, who could grant permission to view it, and how it was to be disposed of at the end of the case. (*Id.* at Confidentiality Agreement ¶¶ 7, 8, 9, 11.)

8. If confidential information was to be included in documents submitted to the court, then "such CONFIDENTIAL MATERIALS, together with those portions of any papers that would disclose the contents of said CONFIDENTIAL MATERIALS, shall be filed in a sealed envelope or envelopes to be opened only by order of this Court." (*Id.* at Confidentiality Agreement ¶ 10.)

9. Any hearing before the court would be conducted in a manner that would maintain the confidentiality of designated information. (*Id.* at Confidentiality Agreement ¶ 14.)

10. Any time confidential information was disclosed during a hearing or deposition, the party disclosing the information could "designate all or a portion of any transcript ... as CONFIDENTIAL MATERIAL under this Confidentiality Agreement within thirty (30) days after receipt of the transcript." Prior to such designation, the entire transcript was to be treated as confidential. (*Id.* at Confidentiality Agreement ¶ 15.)

The parties were evidently able to function cooperatively in discovery for nearly a year under the restrictions they had themselves crafted. Then the wheels came off the cart. On December 17, 2003, the plaintiffs moved for partial summary judgment (D.I.

---

[7]The importance of the requirement that confidential information be identified with specificity and appropriately marked is emphasized by the further provisos that any copy of confidential information must also be stamped (*id.* at Confidentiality Agreement ¶¶ 4, 9) and that, "[w]ith respect to any CONFIDENTIAL MATERIAL that is not produced in paper form (such as diskettes, magnetic media, etc.) and that is not susceptible to the imprinting of a stamp signifying its confidential nature, the PRODUCING PARTY shall, to the extent practicable, produce such material with a cover labeled CONFIDENTIAL." (*Id.* at Confidentiality Agreement ¶ 4.)

5

72) and submitted an opening brief (D.I. 73) and two volume appendix (D.I. 74, 75) with their motion. According to plaintiffs' counsel, a good faith error by his staff resulted in the inclusion in the appendix of material that had been marked "confidential." (See D.I. 160 at A599-600, ¶¶ 18-22.) He discovered it that same day and immediately took steps to remove the offending material. (D.I. 75.) He also informed opposing counsel of what had happened. (D.I. 160 at A599-600, ¶ 22.)

A few weeks later, on January 8, 2004, counsel for the defendants filed a motion (D.I. 82), with supporting brief (D.I. 83), seeking to have plaintiffs' counsel held in contempt for violating the Confidentiality Agreement and related protective order. Referring to the plaintiffs' partial summary judgment briefing, the defendants alleged that "Plaintiffs' counsel deliberately failed to file this brief and the appendices under seal even after Defendants' counsel specifically telephoned Plaintiffs' counsel and reminded him ... [of] the Protective Order. ... Plaintiffs' counsel represented in writing that all confidential material had been removed from both Plaintiffs' brief and appendices ... . That representation was false." (D.I. 83 at 1.) What was apparently even more distressing to the defendants was their belief that "Plaintiffs' counsel also purposefully published a press release containing ... confidential material." (Id.) In a letter to the court filed on January 12, 2004, defendants' counsel asked that the contempt motion be dealt with on an expedited basis and that I convene an emergency teleconference with the parties. (D.I. 84.)

I did convene a teleconference in this case on January 15, 2004, although plaintiffs' lead counsel was unable to be on the call. (Tr. at 6.) Since one of the matters of relief sought by the defendants was to have the plaintiffs' partial summary

6

judgment briefing placed under seal,[8] I discussed with the parties whether both sides were amenable to sealing the documents, so that, "if it's, in fact, the case that some damage could be limited by putting matters under seal," that was done sooner rather than later. (*Id.*) I was endeavoring to preserve the status quo while sorting out who, if anyone, had a legitimate problem requiring court intervention. (*Id.* at 10.) I tried to make clear that I was focused on the state of affairs as it then existed and was not trying to reach back and unwind events that had already taken place. (*Id.* at 14-15.) In that vein, I rejected defense efforts to broaden the scope of the documents placed under seal. (*See id.* ("I am not going to try to go out and retrieve stuff from the public domain.").)

I also discussed with the parties the importance of not having further communications that could reasonably be construed as violating the Confidentiality Agreement and protective order. I was explicit in advising the parties of my concern in that regard, explaining, "I'm very interested in maintaining the press' full and adequate access to the courts and the proceedings in the courts, but when we're talking about confidential information or allegations that confidential information has been wrongly disseminated, I think you will only compound the problem by discussing this matter until we've aired it and discovered whether or not there's substance to the allegations that are made." (*Id.* at 12.) Summing up and attempting to make the ruling limited and precise, I instructed that, "[m]y statements in this regard are solely to do as I said a

---

[8]The full title of the motion was "Motion of Defendants to Place Filings Under Seal and for Dismissal, Sanctions, and Civil Contempt for Violations of a Court Order." (D.I. 82.)

7

moment ago: Maintain the – to the fullest extent possible a *status quo with respect to confidential information* while it gets sorted out." (*Id.* at 12-13; emphasis added.) I immediately put the parties on a schedule to address the defendants' motion regarding alleged violations of the protective order and, indeed, acceded to the plaintiffs' suggestions in regard to the appropriate timing for briefing. (*Id.* at 13-14.)

Other events then intervened. One of the individual defendants, Freebery, was indicted on various federal criminal charges. (*See* D.I. 143 at 1.) At my request (D.I. 131), the parties briefed the question of whether this civil case should be stayed pending the resolution of the criminal proceedings against Freebery. (D.I. 143 at 1.) After considering the parties' positions, I determined that all proceedings in this case should be stayed. (*Id.* at 12.) The plaintiffs have combined the stay order with my direction to avoid discussing arguably confidential material and asserted that "the entire substantive record since January 15, 2004 has been submitted under seal and the public has been denied access." (D.I. 158 at 13.) That is apparently the position that they took to the Court of Appeals and continues to be the basis of their argument on remand that the protective order and, as they characterize it, the "gag order" forbidding discussion of confidential material is too broad.[9] (*See id.* at 1, 18-35.)

**Discussion**

I understand my task on remand to be limited. I am not asked to decide whose position on appeal is correct or whether plaintiffs' earlier motion to modify the protective

---

[9] Particularly fueling the indignation of plaintiffs' lead counsel is his sense that he has been attacked in newspaper advertisements that the County placed for publication and which appeared immediately following my teleconference with the parties on January 15, 2004. (*See* D.I. 94, 95.)

8

order[10] should be granted. As noted in the Introduction, I am to "clarify (a) the scope of the restrictions that ... [have been] placed on the disclosure of court records and discovery information and on communications by counsel to the media and (b) the reasons for any such restrictions[,]" and, in setting out these reasons, I am to "provide specific reasons for each relevant category of documents or information." *Reyes v. Freeberry*, 141 Fed. Appx. 49, at *52 (3d Cir. 2005). In short, I am asked for a statement of what happened and why.

A.  *The Scope of the Restrictions.*

As for the question of what happened, i.e., the scope of the restrictions, I address first the Confidentiality Agreement and related protective order. The parties were seeking to protect non-public "personnel information" from County police records, non-public information about "police strategies and deployment implemented for public protection[,]" and non-public information associated with the identity of third parties, such as witnesses or victims of crimes. (D.I. 17 at Joint Motion ¶ 4.) While the form of order to which they agreed had boilerplate language indicating that they were not limiting themselves to seeking protection for just those categories of information (*see id.*), the specified categories were their own effort to define the limits of confidentiality

---

[10]The full title of that motion was, "Plaintiff's Motion (1) to Void *Ab Initio* the Confidentiality Agreement and Protective Order in this Case; (2) to Make Judicial Records, Which the Defendants Do Not Want Revealed, Available to the Public; (3) to Unseal D.I. 72, 73, 74, and 80; (4) to Unseal D.I. 86 and all Proceedings relating to D.I. 82 to Allow Counsel to Publicly Defend Himself from the Newspaper Advertisements of the Defendants Which Are Defaming Him; and (5) in the Alternative, to Modify the Protective Order in this Case." (D.I. 94.)

9

and they are what I have understood the scope of the protective order to be, although I was not the judge who signed it.

Turning to the status quo order I delivered during the January 15, 2004 teleconference, two sets of restrictions were imposed. First, by agreement of the parties, certain docket entries were placed under seal pending my review of them in connection with the defendants' motion to have them placed permanently under seal and to have sanctions imposed on plaintiffs' counsel. (Tr. at 6-7.) The restriction on the specified docket entries was total. Second, I instructed the parties not to do anything further that might reveal confidential information until I could review the allegations made by the defendants concerning the plaintiffs' partial summary judgment briefing. The limitation was not a "gag order" on all public communications about the case. It was explicitly not that. (*Id.* at 12-13.) It was "solely" a direction that the parties not reveal arguably confidential information until I could sort out who was closer to the mark in interpreting the boundaries of the protective order. (*See id.* ("My statements in this regard are solely to do as I said a moment ago: Maintain the – to the fullest extent possible a status quo with respect to confidential information while it gets sorted out.").)

B.  *The Reasons for the Restrictions.*

As for the question of why the restrictions were placed in the protective order and in my January 15, 2004 status quo order, i.e., the specific reasons for each category of restriction, I again address first the Confidentiality Agreement and related protective order. The first but not most important reason for the restrictions is that the parties themselves, through experienced counsel, considered the kinds of information that could appropriately be called "confidential" and they mutually consented to specific

categories of information being so listed in the Agreement. After full opportunity to consult with one another and consider the relevant law, they bound themselves to the restrictions at issue.

Second, looking at the category of personnel information, there is a strong public policy expressed in a state statute favoring the confidentiality of police personnel records. See 11 Del. C. § 9200.[11] That public policy weighs heavily in favor of providing "confidential" status to information demanded from police personnel files. See Jones v. City of Wilmington, 299 F. Supp. 2d 380, 394 (D. Del. 2004) ("[A] federal court must balance the plaintiff's interest in disclosure against the state's legitimate concern of protecting the confidentiality of the officers' personnel files from unnecessary intrusions.") (quoting Mercado v. Div. of N.Y. State Police, 989 F. Supp. 521, 522 (S.D.N.Y. 1998)). Closely related to that statutorily expressed policy is the fundamental respect courts and litigants should have for the privacy of individuals who have no desire to involve themselves in the parties' dispute. It may be that the plaintiffs have legitimate employment discrimination claims under federal civil rights statutes, but vindicating their rights need not come at the expense of the privacy of their present and former colleagues associated with the County police department.

---

[11] Subsection (d) of that statute states that, "[u]nless otherwise required by this chapter, no law-enforcement agency shall be required to disclose in any civil proceeding, other than those brought by a citizen against a law-enforcement officer alleging that the officer breached the officer's official duties and that such breach resulted in injury or other damage to the citizen, any: (1) Personnel file; or (2) Internal affairs investigatory file compiled in connection with a law-enforcement officer under investigation or subjected to questioning for any reason which could lead to disciplinary action, demotion, or dismissal."

11

Third, as to the category of "police strategies and deployment implemented for public protection[,]" there is again a clear and important public policy in favor of maintaining the confidentiality of police sources of information and methods of law enforcement. Criminals, by definition, do not play by the rules. To deal with criminals, the police must often employ undercover tactics, the efficacy of which depends upon secrecy. Also, since limited resources and our society's commitment to civil liberties prevents the police from being everywhere all the time, the police must target for enforcement specific kinds of illegality, in specific geographic locations, at specific times. How the police plan and execute the deployment of their resources is a matter that, in general, is rightly kept confidential until such time as they deem it appropriate to share with the public.

Fourth, as to identifying information about third parties, such as witnesses and victims of crime and others who have somehow become involved in an investigation, a due regard for the privacy of such bystanders to this case is itself a sufficient reason to grant the information confidential status. Beyond that, there is the public policy imperative that people be comfortable in providing information to the police. If, for example, witnesses or victims of crime were concerned that their identities could be revealed at any time because someone with whom they have no meaningful connection chooses to file a lawsuit, then the flow of information critical to successful law enforcement would be adversely affected.[12]

---

[12] I recognize that the foregoing may not be sufficient to assist the Court of Appeals in understanding whether the parties' dispute about the disclosure of any category of information is or is not related to the merits of this particular case. Since I did not hear the parties at the time they submitted the form of order, however, I cannot

12

As for the reasons I imposed the restrictions I did during the January 15, 2004 teleconference, first, the sealing of the plaintiffs' partial summary judgment briefing was a matter of consent. The parties agreed it was appropriate to allow me time to review their respective positions on the scope of the protective order. The restrictions I imposed were not a product of any review of the positions themselves, which had not yet been fully developed. When, for reasons unrelated to the dispute over the protective order, I determined that the case must be stayed, I denied all pending motions, without prejudice, and suspended my review of the issues associated with the protective order. I believed then and continue to believe that, in light of the overlap between certain allegations in this case and in the criminal case, a stay is necessary to preserve Freebery's right to a fair criminal trial and to preserve the rights of all the parties in this case to full and fair access to evidence without the severe complication that would attend Freebery's invocation of her Fifth Amendment rights. (*See* D.I. 143 at 5-7.)

I directed the parties to avoid public comment on arguably confidential information for three reasons. First and most obviously, I needed time to decide whether one side or the other or both had taken unreasonable positions with respect to the designation and treatment of confidential information. Second, it was apparent that the litigation had reached a point where some cooling off was required, since charges and countercharges of unethical behavior are typically, and were here specifically,

---

provide any further insight. I have stated here only the reasons why I believe good cause exists to maintain the restrictions set forth in the order, as I have described those restrictions.

contrary to the public interest in the fair and efficient administration of justice. Finally, I saw no downside to instructing the parties to do what they ought to have been doing in any event, namely avoiding the revelation of information that at a calmer time they had recognized should be treated as confidential. I reiterate that I have not decided that any inappropriate revelation in fact took place. Having first emphasized the right of the press and public to have access to court proceedings, I merely told the parties that they should stay away from revealing information that could reasonably be called "confidential" under the terms of their own Agreement and the court's protective order. (Tr. at 12-13.) Far from being a blanket "gag order," the instruction I gave was to obey the order they themselves had sought. In other words, if the question is whether the direction I gave the parties covered solely information given in discovery pursuant to the protective order, the answer is yes. *Cf. Reyes*, 141 Fed. Appx. at *51 ("When a civil litigant obtains discovery pursuant to a valid protective order, the litigant has no First Amendment right to disclose the information." ).

## Conclusion

This is not an opinion in the traditional sense of resolving a dispute between parties, but is instead an effort to clarify the record, as required by the Court of Appeals. Accordingly, no order accompanies this. I have endeavored to answer the questions posed but welcome the opportunity to revisit the assignment, if the Court of Appeals views the foregoing as inadequate to assist it in determining whether there is jurisdiction over the plaintiffs' interlocutory appeal.